# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
PAUL T. AQUINO,                        )
                                       )
    Plaintiff,                     )
                                       )    **Civil Action No.**
    v.                             )    **03-40285-FDS**
                                       )
PACESETTER ADJUSTMENT COMPANY )
and ACE FIRE UNDERWRITERS              )
INSURANCE COMPANY,                     )
                                       )
    Defendants.                    )
_____)


## <u>MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

**SAYLOR, J.**

This matter involves a claim under Mass. Gen. Laws ch. 93A for alleged unfair or deceptive practices in the business of insurance as defined in Mass. Gen. Laws ch. 176D, § 3. Federal jurisdiction is based upon diversity of citizenship.

Plaintiff Paul T. Aquino was injured in July 2000 when his vehicle collided with a vehicle owned by March Taxi, Inc. Defendant Ace Fire Underwriters Insurance Company ("Ace") provided the primary insurance coverage for March Taxi. Ace retained defendant Pacesetter Adjustment Company to handle Aquino's claim.

Aquino brought an action in state court against March Taxi and Eric Coleman, the driver of the taxi, for injuries he sustained in the accident. In accordance with its duty to defend March Taxi, Ace arranged for and compensated defense counsel in that action. Aquino was awarded $184,722.62, an amount that exceeded the limit of the primary insurance coverage ($100,000).

After the verdict, the case was settled for $170,000; the settlement was funded by Ace up to the

limit of the primary coverage; an excess carrier, General Star Insurance Company, funded the

remainder.

The present action alleges that defendants violated Chapter 176D, and thus Chapter 93A,

by making a number of misrepresentations regarding the excess insurance policy.  First, Aquino

contends that defendants failed to produce information to him about the excess policy provided by

General Star—an apparently unrelated company that is not a defendant in the present action—and

failed to give notice to the excess carrier about the possible claim.  The excess carrier was

eventually identified, however, and contributed to the settlement in accordance with its policy.

Second, Aquino contends that defendants inaccurately characterized the primary policy as

affording combined single limit coverage of $100,000 for property damage and bodily injury.  The

mistaken description of the primary coverage was corrected, however, before any harm was done.

Plaintiff admits, forthrightly, that he incurred *no* loss or harm of *any* kind as a result of the

defendants' alleged misrepresentations.  Nonetheless, plaintiff seeks three times his "actual

damages"—defined, for these purposes, under Chapter 93A as the amount of the judgment in the

underlying claim, or $184,722.62—plus attorneys' fees.[1]  He thus seeks to recover in excess of

$554,167 in "damages" in this action, despite the complete absence of any actual harm.

Plaintiff's claim is an outgrowth of two developments in the law of Chapter 93A.  The first

is the decision of the Massachusetts Supreme Judicial Court in *Aspinall v. Philip Morris Cos.*,

442 Mass. 381, 402 (2004), apparently holding that a plaintiff under Chapter 93A need not prove

---

[1] Chapter 93A, § 9 generally permits the doubling or trebling of actual damages for willful or knowing violations.  If plaintiff's actual damages are $184,722.62, he conceivably may be entitled to recovery of $369,445.24 or $554,167.86 as double or treble damages.

the existence of any actual loss or harm in order to recover under the statute.[2]  The second is the amendment to the statute in 1989 defining "actual damages," for purposes of double or treble damages, to be "the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence."  *See* 1989 Mass. Legis. Serv. ch. 580, § 1, codified at Mass. Gen. Laws ch. 93A, § 9(3).  Putting the two together, plaintiff contends that even though his actual (real-world) damages are zero, his "actual" (statutorily-defined) damages exceed $184,000, and therefore he is entitled to a treble damages award of more than $554,000 if he can prove a willful or knowing violation of Chapter 93A.

This action potentially presents a serious constitutional question:  whether punitive damages exceeding half a million dollars can be awarded to a plaintiff whose actual (real-world) damages are zero.  *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 580-82 (1996) (punitive damages must bear a reasonable relationship to the actual harm inflicted on the plaintiff); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2003) (the "measure of punishment" must be "both reasonable and proportionate to the amount of harm to the plaintiff

---

[2]  The SJC had previously ruled in *Leardi v. Brown*, 394 Mass. 151, 160 (1985) that Chapter 93A "create[s] a legal right, the invasion of which, without more, constitutes an injury."  However, many courts and commentators had generally concluded that the holding was limited to the particular facts of that case, which involved illegal clauses in a residential lease.  *See, e.g.*, *Lord v. Commercial Union Ins. Co.*, 60 Mass. App. Ct. 309, 323 (2004).  The *Aspinall* court expressly rejected that limitation.  442 Mass. at 401-02.

Somewhat paradoxically, the SJC in *Aspinall* also reaffirmed that "causation is a required element of a successful [Chapter] 93A claim."  442 Mass. at 401.  In doing so, the court expressly affirmed the statement in *Lord* that the Massachusetts legislature, in enacting and amending Chapter 93A, "did not intend to confer on plaintiffs who have suffered no harm the right to receive a nominal damage award which will in turn entitle them to a sometimes significant attorney's fee recovery."  *Id.* (quoting *Lord*, 60 Mass. App. Ct. at 321-22).  The court also cited with approval (and quoted) two earlier opinions stating that the plaintiff must show that the wrongful act caused a loss.  *Id.*, quoting *Massachusetts Farm Bur. Fed'n v. Blue Cross of Mass., Inc.*, 403 Mass. 722, 730, 532 N.E.2d 660 (1989) ("In the absence of a causal relationship between the alleged unfair acts and the claimed loss, there can be no recovery") and *International Fid. Ins. Co. v. Wilson*, 387 Mass. 841, 850, 443 N.E.2d 1308 (1983) ("plaintiff must show . . . a causal connection between the deception and the loss").

and to the general damages recovered").[3]  In *Gore*, the Supreme Court held that a 500-to-1 ratio between punitive and actual damages was "grossly excessive," and violated the Due Process Clause of the United States Constitution.  517 U.S. at 574.  In *State Farm*, the Supreme Court held that a 145-to-1 ratio was presumptively unconstitutional, and indeed anything greater than a single-digit ratio between punitive and actual damages would likely violate due process.  538 U.S. at 425.  By contrast, the ratio here between the claimed punitive and actual (real-world) damages is infinite—554,167 to 0.

This Court does not, however, need to reach that issue, because plaintiff cannot establish that the conduct of defendant constituted an unfair or deceptive act within the meaning of Chapter 93A.  In particular, plaintiff has not identified any unfair claim-settlement practice of the defendants that would support a claim under Chapter 176D.  Accordingly, defendant's motion for summary judgment will be granted.

## I.    <u>Background</u>

### A.    <u>The Accident and the Initial Efforts to Ascertain Insurance Coverage</u>

On July 12, 2000, Aquino was injured in a collision between the vehicle he was operating and a taxi cab owned by March Taxi and operated by Eric Coleman.  Aquino retained attorney John F. Keenan, Jr., to represent him in connection with personal injury claims arising out of the accident.

Ace was March Taxi's primary insurer.  The cab company also carried an excess insurance policy with General Star, a company with no apparent relationship to Ace.

---

[3] Multiple damages under Chapter 93A are punitive in nature.  *See Kapp v. Arbella Mut. Ins. Co.*, 426 Mass. 683, 686 (1998) (quoting *Yeagle v. Aetna Cas. & Sur. Co.*, 42 Mass. App. Ct. 650, 655 (1997)) (Chapter 93A double and treble damages are "avowedly punitive").

4

By a letter dated July 14, 2000, Keenan informed Ace that he represented Aquino in a claim for damages for bodily injury sustained in the accident.[4]  Among other things, the letter made "statutory demands for coverage disclosure."[5]  The Ace Claims Office received the letter on July 25.

From that point forward, it took Ace nearly five months to provide plaintiff with any of the information requested by Keenan.  After receiving no response to his July 14 letter, Keenan followed up with a letter dated August 11, 2000, making a formal request under Mass. Gen. Laws ch. 175, § 112C for "disclosure of the amount of the limits of your insured's liability coverage, including excess and umbrella liability coverages with your company or with any other company."  Ace retained Pacesetter, an independent insurance claims adjuster, to handle Aquino's claims.  On September 15, 2000, Pacesetter acknowledged to Keenan that it had received notice that he was representing Aquino.  It also advised Keenan that it had requested the "declaration page" of March Taxi's insurance policy in order to confirm the available coverages and limits of liability, and that it would forward a copy of the declaration page to his office.

The declaration page, also known as the coverage-selection page, is a short summary of insurance coverage that identifies, among other things, the policy limits in various categories, such

---

[4] The letter was actually directed to Cigna Fire Underwriters, the parent of Ace.  Apparently, Aquino had been informed that the primary insurer was Cigna; the "Operator's Report of Motor Vehicle Accident," completed by Coleman on July 17, indicated that the taxi cab was insured by Cigna.

[5] The letter did not identify the relevant statute, but presumably Keenan meant Chapter 175, § 112C, which provides:

> Any insurer doing business in the commonwealth shall reveal to an injured party making claim against an insured, the amount of the limits of said insured's liability coverage, upon receiving a request in writing for such information from the injured party or his attorney. A reply shall be made within thirty days of receiving such request. Any insurer who fails to comply with the provisions of this section shall be liable to pay to the claimant the sum of five hundred dollars plus reasonable attorneys' fees and expenses incurred in obtaining the coverage information provided for herein..

as "personal injury" and "property damage."  A declaration page is typically provided to each insured (in this case, March Taxi) by the agent who sold the policy.  March Taxi had apparently purchased the Ace policy through Stone Insurance Agency, an independent insurance agent.

Pacesetter still had not provided the information by mid-October.  Accordingly, on October 19, 2000, Keenan again asked Pacesetter to furnish coverage information for the March Taxi policy.  Keenan enclosed a copy of his August 11 letter to Ace requesting coverage disclosure.

When no response was forthcoming, Keenan made yet another request to Pacesetter on November 3, 2000.  In response to this request, Pacesetter sought coverage information and a copy of the declaration page of the March Taxi policy from Stone Insurance.  On November 29, Keenan informed Pacesetter that he still had not received coverage information; he again enclosed a copy of his August 11 letter.

On December 11, 2000, Pacesetter faxed Stone Insurance an insurance coverage confirmation form for the March Taxi vehicle involved in the July 12, 2000 accident.  Pacesetter asked Stone to complete the form and return it along with a copy of the declaration page of the March Taxi policy.[6]

According to Paul Pearson, the President of Pacesetter, Stone Insurance informed Pacesetter on December 13 that the March Taxi policy limit was $100,000 combined single limit ("CSL").[7]  The term "combined single limit" refers to a single maximum amount of coverage

---

[6] The affidavit of Paul Pearson suggests that Stone Insurance completed this form and returned it to Pacesetter on December 12.  However, the coverage-confirmation form, which is signed by a Stone Insurance representative, is dated December 29, 2000.

[7] It appears that this was communicated orally.

6

(here $100,000) available to satisfy all claims, whether for property damage or bodily injury. Stone Insurance also informed Pacesetter that there was excess coverage with unknown limits and an unknown carrier.[8]

The same day, December 13, Pacesetter representative Jessica Clark orally advised Keenan that the March Taxi policy had a liability limit of $100,000 CSL and that there was also an excess policy with another carrier. Keenan's handwritten notes of the conversation with Clark state as follows: "100G combined single limits w/ Ace. There is excess cov w/ another carrier - sug they be notified - positive MRI?"[9]

Clark documented the December 13 conversation in a letter to Keenan on December 20. The letter stated in relevant part: "This will document our conversation of December 13, 2000 wherein we advised the above referenced policy has a combined single liability limit of $100,000.00. There is also an excess policy with another carrier." Clark also asked Keenan to provide Aquino's preliminary medical reports so Pacesetter could determine whether his bodily injury exceeded policy limits.

Stone Insurance completed the coverage confirmation form and faxed it back to Pacesetter on December 29, 2000. Among other things, the form stated: "Liability Limits: 100,000 CSL." The declaration page apparently was not provided to Pacesetter at the time, and thus not to Keenan.

### B.    The Lawsuit and Aquino's Discovery Requests

---

[8] A logical inference is that the excess policy was not purchased by March Taxi through Stone Insurance, but the record is silent on the subject.

[9] Plaintiff argues that these handwritten notes indicate that Keenan suggested that Pacesetter should notify the excess carrier due to a positive MRI performed on Aquino.

In January 2002, Aquino filed a civil complaint against March Taxi and Coleman in the East Brookfield District Court. The complaint alleged negligence in the operation of a motor vehicle and sought damages for bodily injuries and medical expenses.

On January 18, Aquino served March Taxi and Coleman with requests for document production. Plaintiff requested that defendants produce, among other things, "[c]opies of the coverage selections pages of all insurance agreements under which any person carrying on an insurance business may be liable to satisfy part or all of the judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment, including so-called umbrella and excess policies."[10]

On March 11, Aquino filed requests for defaults against defendants for their failure to file and serve answers to his complaint. The court entered a notice of default as to both defendants shortly thereafter.

On March 22, Pacesetter retained attorney Gerard Laurence to represent March Taxi (and, presumably, Coleman) in the lawsuit. Ace (through Pacesetter) paid for Laurence's legal services. On March 24, Laurence filed answers on behalf of March Taxi and Coleman, and arranged for removal of the default.

According to Laurence, on April 1, 2002, he received a letter from Michael Walsh, a senior claim supervisor at Pacesetter, indicating that there was a $100,000 insurance policy on March Taxi.[11] There is no evidence that Laurence was made aware of the excess policy at that

---

[10] The "coverage selection" page and the "declaration" page are, at least for present purposes, the same thing.

[11] This letter does not appear to have been submitted to the Court.

time.

Aquino's document requests apparently languished without any response for several months. At some point, the District Court ordered that discovery be completed by September 20, 2002. On September 6, Stephanie LeBlanc, a paralegal in Laurence's office, informed Pacesetter that Aquino had propounded requests for document production on March Taxi and Coleman, which included a request for "[t]he policy declaration page" of the March Taxi insurance policy. LeBlanc's letter indicated that the request was reasonable and asked that the declaration page be forwarded to her as soon as possible, along with other documents requested by Aquino. On September 12, she again asked Pacesetter to forward the documents requested in the September 6 letter; she asked that the documents be sent no later than the September 20 discovery deadline.

In a letter to Laurence dated September 20, Pacesetter acknowledged receipt of the September 12 letter and enclosed copies of the documents requested by Laurence, with the exception of the declaration page. Pacesetter also sent a copy of the coverage-confirmation form it received from Stone Insurance in December 2000. With regard to the declaration page, Pacesetter stated: "[W]e requested the Dec page, but it was not provided. We will request this from the underwriting department on a 'rush' basis." Under ordinary circumstances, Laurence's client, March Taxi, would have had a copy of the declaration page in its files; there is no explanation in the record as to why Laurence did not obtain the document directly from his client.

In any event, at some point on September 20, Stone Insurance sent Pacesetter a fax copy of the declaration page of the Ace policy for March Taxi. Pacesetter then faxed the page to Laurence. Laurence served Keenan with responses to plaintiff's request for production of documents on the same day; he attached a copy of the coverage-confirmation form and the

9

declaration page of the March Taxi insurance policy. Counsel for plaintiff thus received the declaration page more than two years after Pacesetter first promised to provide it.

The declaration page contained separate categories of coverage with corresponding descriptions of coverage limits. The "OPTIONAL BODILY INJURY" and "PROPERTY DAMAGE" coverage categories were listed consecutively in that order. The optional bodily injury category had the following corresponding coverage limit:

                    EACH PERSON
                    EACH ACCIDENT
          $100,000       COMBINED SINGLE LIMIT

The coverage category which immediately followed stated "PROPERTY DAMAGE (COMPULSORY LIMIT $5,000)" and had the following corresponding coverage limit: "$100,000       COMBINED SINGLE LIMIT."

### C.    The Initial Settlement Demands

Although Ace and Pacesetter were hardly diligent in providing the terms of the primary policy to Keenan, the delay does not appear to have affected Aquino's settlement demands or trial strategy in any respect. As noted, the policy limit was represented to be a combined single limit of $100,000. After the accident, and prior to filing suit, Aquino's highest settlement demand was $40,000. After suit was filed, and prior to the trial, Aquino demanded $32,000. Keenan advised Pacesetter that he believed the case could settle for $22,500, and in response, Pacesetter made a counteroffer of $20,000.

The day before trial, Keenan indicated that Aquino would accept no less than $50,000 to settle the case. The parties failed to reach an agreement. At no point prior to the trial did plaintiff make a settlement demand exceeding $50,000.

**D.     The Trial**

A bench trial was held in the East Brookfield District Court in late 2002 or early 2003. On February 21, 2003, the presiding judge issued a judgment awarding plaintiff damages of $161,125, plus interest in the amount of $21,347.96 and costs of $236.70, for a total judgment of $182,709.66.[12]

**E.     Developments after the Trial**

The relatively large award meant that the coverage limits—and the possible existence of an excess policy—had become significant issues.  On March 12, 2003, Laurence wrote to Keenan: "Following up on our discussion this morning on this case, it does appear that the amount of coverage is $100,000."  He also enclosed a copy of the coverage confirmation form from Stone Insurance that he had previously provided to plaintiff.  Laurence's letter further stated:  "I assume that you would settle the case for the amount of the policy.  Let me know if your position is any different.  I will contact the insurer to recommend payment of that amount in return for a release of the insureds."

The same day, Laurence sent a letter to Pearson, informing him of the amount of the judgment for Aquino and opining that there were no grounds for appeal.  The letter went on to say:

> The coverage as I understand it is $100,000.  I spoke with Attorney Keenan relative to the finding and he was under the impression that there was $1,000,000 in coverage and stated that he would accept the amount of the finding without interest or costs. I indicated to him that my understanding was the $100,000 policy was all that was available to the defendants.  He said that if that were the case, then he would need to obtain the full policy. . . . [M]y advice is to settle the claim for $100,000 and obtain

---

[12] The Writ of Execution On Money Judgment issued on March 31 in the amount of $184,722.62, including post-judgment interest of $2,012.96.

a release of the defendants so that they are not open to any claim over the amount of the insurance policy.

The following day, March 13, Laurence told Pearson that Keenan had contacted him regarding the issue of potential excess coverage. Laurence had told Keenan that his file reflected only a $100,000 policy with Ace. Keenan, in response, had faxed Laurence a copy of a letter from Pacesetter dated December 20, 2000, (a letter Laurence "did not have in [his] file") which stated that there was "also an excess policy with another carrier." Laurence asked Pearson to "advise as to whether there is in fact other coverage available to the defendants for this adverse finding."

Also on March 13, Laurence sent Pearson a follow-up letter, stating that the judgment for Aquino was "surprising," but again opining that there was no appealable issue. The letter also stated:

> As far as an excess carrier being involved, as I indicated to you, we were unaware of the involvement of such a carrier until last week when Attorney Keenan provided us with a copy of a letter from your office indicating that an excess carrier most probably existed. Prior to that time, we had been informed by your office that the coverage available to the defendants was the $100,000 policy with [Ace].

> . . . [T]he judgment needs to be faced and I would expect that plaintiff's counsel would not compromise it other than waiving interest and costs, if he is still willing to [do] that.

On March 21, 2003, Pearson responded:

> We were shocked to receive the judgment in this case . . . . Prior to trial the demand was $32,000 and our offer was $20,000. This [judgment] is in excess of our policy limits and the insured may be exposed.

> . . . It will now be necessary that we notify the Excess Carrier of this unbelievable [judgment]. . . .

> We did not receive a pre-trial report from your office nor any indication of the possibility of such a [judgment]. There was really no reason to notify the excess

12

carrier with a demand of $32,000.

On March 26, Pearson sent Keenan a letter stating:

> We have a $100,000 CSL limit of coverage provided to the named insured, March Taxi. We previously paid property damage to your client [totaling] $4,144.48. We have $95,855.52 remaining on the policy limit which we offer in full and final settlement of all claims.

The following day, March 27, Pearson spoke directly with Keenan; Keenan made handwritten notes of the conversation. The notes stated: "[N]othing in file to ID excess carrier - unlikely cab co would have excess cov - looking into it. - told wd. not release for primary coverage - suggested he send ck in pt satis of judgement."

### F.    The Identification of the Excess Carrier

Laurence testified in his deposition that he learned from Pacesetter that there was excess insurance coverage for March Taxi on either March 26 or 27. The record does not reflect who at Pacesetter told Laurence about the excess coverage, or how he learned that General Star was the insurer, or why those facts were not discovered at an earlier date. Presumably, March Taxi (Laurence's client) had purchased the excess policy, and was aware of its existence and contents. There is no evidence to suggest that the knowledge, if any, of March Taxi should be imputed to Ace or Pacesetter.

In any event, on March 27, Laurence wrote to Keenan that "there does appear to be an excess insurer involved in the case and my understanding is that Pacesetter is getting in contact with them in order to advise them as to what transpired in this case. . . . [W]e will let you know once we hear anything."

On April 3, Pearson sent a letter to the excess insurer, General Star, which stated:

We represent the Primary Insurance Company, ACE USA, and the insured, March

13

Taxi, for an automobile accident occurring July 12, 2000, involving the plaintiff, Paul Aquino.

We are enclosing a complete copy of the file for your review and records.

For the last two and half [sic] years we have attempted to settle this case within the primary limits of coverage without success. Prior to trial the demand was $32,000 and our [offer] was $20,000. Because the demand was less than $50,000, there was no reason to place the Excess Carrier on notice of this matter. Unfortunately, this case went to trial and the judge awarded $163,125 . . . plus interest and costs. Under the terms of the primary policy, we have offered $100,000 in our attempt to get this matter settled. The [plaintiff's] attorney will not accept $100,000 in full settlement of this claim. It will be necessary that we coordinate our efforts and try and get this case concluded.

In a letter dated April 9, Pearson informed Keenan that Pacesetter was "currently awaiting word from the excess carrier General Star Insurance Company." In a fax dated April 16, General Star asked Pearson to attempt to resolve the Aquino case, and provided settlement authority up to $50,000. On April 23, Pearson provided Keenan with the address for General Star and Stone Insurance, and informed him that Pacesetter had sent a copy of Aquino's file to General Star.

### G.    The Resolution of the "Combined Single Limit" Issue

In the meantime, Keenan disputed whether the policy was in fact a combined single limit policy. In his letter of April 9, Pearson had written to Keenan:

As we have previously indicated, we have $95,855.52 remaining on the policy limit which we offer in partial satisfaction of the [judgment] in this case. We request that you allow us to pay this partial satisfaction and within the next 15 days or so we should have word from General Star.

Keenan responded on April 18, contending, without elaboration, that there was separate coverage for property damage, based on the terms of the declaration page. In a letter dated April 21, Pearson responded "We have again checked the coverage for the Insured, March Taxi and find that this is a $100,000 combined single limit liability policy. There is no separate coverage

14

for property damage liability in this case." Pearson also offered $140,000 in settlement.

Meanwhile, Pacesetter asked Ace to investigate the policy and to provide its opinion as to coverage limits. In a fax to Ace dated May 5, a Pacesetter representative wrote: "Per our discussion, please see following [declaration] page for March Taxi . . . . Please verify compulsory and/or optional coverages." A representative of Ace examined the declaration page of the March Taxi policy and informed Pacesetter that there were separate limits for bodily injury and property damage. After learning this, Pacesetter decided to pay Aquino $100,000 under the bodily-injury limit of the policy.

The record does not disclose how or why Ace arrived at the conclusion that there were separate coverage limits for bodily injury and property damage.

### H.    The Settlement

On May 7, 2003, General Star and Keenan agreed to a $170,000 settlement, with Pacesetter contributing $100,000 under the bodily injury limit of the primary policy and General Star contributing the balance of $70,000 under the excess policy. Aquino executed a general release and stipulation of dismissal on May 9.

### I.    The Present Dispute

On July 1, 2003, Keenan sent Ace and Pacesetter demand letters pursuant to Chapter 93A, § 9. A further demand was made on July 21, in which Keenan asked for settlement in the amount of $365,419.32—double the judgment for Aquino in the underlying civil action, plus attorney's fees in the amount of $60,000. Both demands were rejected.

Aquino filed suit against Ace and Pacesetter on November 13, 2003, in the Clinton Division of the District Court Department. The complaint alleges that defendants violated

Chapter 93A, § 9, by engaging in unfair claim settlement practices as defined in Chapter 176D, § 3(9)(a).  It requests actual damages and costs, and, pursuant to Chapter 93A, § 2, seeks double or triple plaintiff's actual damages for defendants' alleged knowing and wilful violation of Chapter 93A.  On December 16, 2003, defendants removed the action to this Court based on diversity of citizenship.

On April 1, 2005, defendants filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.    <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)).  The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor.  *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).

## III.    <u>Discussion</u>

Aquino contends that defendants committed unfair claim settlement practices under

Chapter 176D, § 3(9)(a) and are therefore liable under Chapter 93A, §§ 2, 9, which prohibit unfair and deceptive acts or practices in the conduct of trade or commerce.

### A.    Statutory Framework

Chapter 176D, § 3 defines "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance" as including, among other things, "unfair claim settlement practices."  Subsection 9 catalogues fourteen acts or omissions that constitute unfair claim settlement practices, the most relevant for present purposes being "misrepresent[ations] [of] pertinent facts or insurance policy provisions relating to coverages at issue."  *See* Mass. Gen. Laws ch. 176D, § 3(9)(a).

Chapter 93A generally outlaws "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.  The statute affords a right of action to "[a]ny person . . . who has been injured by another person's use of or employment of any method, act or practice declared to be unlawful by section two . . . or any person whose rights are affected by another person violating the provisions of [Chapter 176D, § 3(9)]."  *Id.* § 9(1).  Thus, although Chapter 176D creates no private right of action, consumers injured by insurance practices proscribed under Chapter 176D may sue under Chapter 93A. *Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830, 839 (1st Cir. 1990).[13]

In order to prevail on a claim for violation of Chapter 176D (and therefore Chapter 93A),

---

[13] Ordinarily, an insurer will be deemed to have violated Chapter 93A, § 2 to the same extent that it is found to have violated Chapter 176D, § 3(9).  *Hopkins v. Liberty Mutual Ins. Co.*, 434 Mass. 556, 564 (2001) (explaining that if an insurer's conduct amounts to an unfair or deceptive act or practice in the business of insurance under Chapter 176D, § 3(9), it is also, by definition, an unfair or deceptive act or practice under Chapter 93A, § 2); *Schwartz v. Travelers Indemnity Co.*, 50 Mass. App. Ct. 672, 675 (2001) ("[C]onduct prohibited by [Chapter 176D] [is] made unfair and deceptive by [Chapter 93A], § 9 . . ."); *Peckham*, 895 F.2d at 839-840 (affirming finding that the defendant committed an unfair practice where it failed to inform the insured of pertinent facts relating to insurance coverage).

the plaintiff must establish that (1) an unfair or deceptive act or practice has been committed; and

(2) that the commission of that act or practice has caused him an injury within the meaning of

Chapter 93A, § 9(1).  *Lord*, 60 Mass. App. Ct. at 321-22; *Aspinall*, 442 Mass. at 401.

A negligent act, standing alone, will not support Chapter 93A liability.  *Glickman v.*

*Brown*, 21 Mass. App. Ct. 229, 235 (1985); *see also Meyer v. Wagner*, 429 Mass. 410, 424

(1999); *Swanson*, 389 Mass. at 349 ("[N]ot every negligent act is unfair or deceptive and thus

unlawful under [Chapter 93A].").  Likewise, negligent misrepresentation is not ordinarily

actionable under the statute, unless the defendant's conduct is "extreme or egregious."  *Marram*,

442 Mass. at 62; *see also Foisy v. Royal Maccabees Life Ins. Co.*, 241 F. Supp. 2d 65, 69-70

(rejecting "attempt to bootstrap [a] negligent misrepresentation verdict into a violation of Chapter

93A"); *Walsh v. Chestnut Hill Bank & Trust Co.*, 414 Mass. 283, 287-288 (1993) (upholding

ruling that defendant did not violate Chapter 93A simply because the jury found for plaintiff on

the negligent misrepresentation claim).  *But see Glickman*, 21 Mass. App. Ct. at 235 (upholding

finding of Chapter 93A liability based on negligent misrepresentation where the defendant "made

no effort to determine the truth").

Thus, although it is possible to recover in insurance cases "for a deceptive act that is the

result of a defendant's negligence," *Swanson*, 389 Mass. at 349, courts have required plaintiffs to

show that the defendant deliberately misrepresented the extent of insurance coverage, or

otherwise acted in bad faith or with an improper motive, in order to establish a violation of

Chapter 176D, § 3(9)(a).  *See United States ex. rel. Metric Electric, Inc. v. Enviroserve, Inc.*,

301 F. Supp. 2d 56, 70 (D. Mass. 2003) (no Chapter 93A liability for misrepresentations as to

insurance coverage; "[a]lthough many of [the insurance company's] conclusions were incorrect,

18

there is no indication that the defendant did not believe them to be true at the time"); *Panzarella v. Travelers Ins. Co.*, No. 96-012, 2002 Mass. Super. LEXIS 160, *49-54 (Apr. 24, 2002) (claim that insurance company misrepresented the amount of primary insurance coverage and failed to disclose the amount of umbrella coverage in a timely manner; no liability because these acts, although negligent, "sloppy[,] and unprofessional," were not intentional or the result of "ulterior or nefarious" motives); *Shamban v. Worcester Ins. Co.*, No. 96-01479, 1997 Mass. Super. LEXIS 493, *17 (Apr. 22, 1997) (claim that insurance company misled plaintiff by stating that coverage was unavailable; an insurance company may expose itself to liability under [Chapter 93A] where it exercises bad faith, but "bad faith is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose or some moral obliquity.") (citations and internal quotation marks omitted); *cf. Foisy*, 241 F. Supp. 2d at 69 (claim for misrepresentation of benefits, advantages, conditions, or terms of an insurance policy under Chapter 176D, § 3(1)(a); defendants did not "purposely 'misrepresent[]' any benefit such that liability under chapter 176D would be appropriate"); *Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 343 (1994) (Chapter 93A claim based on purported violation of Chapter 176D, § 3(9)(g); "A plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply . . . unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D").

## B.  Whether Defendants Committed an Unfair or Deceptive Act or Practice

Plaintiff alleges that defendants are liable under Chapter 93A for alleged

misrepresentations regarding the insurance coverage of March Taxi[14] based on the following conduct:

1.  Defendants' failure to notify the excess carrier of Aquino's claims after Keenan allegedly suggested that Pacesetter should do so on December 20, 2000;

2.  Defendants' provision of only the declaration page and insurance coverage information of the Ace insurance policy, and not that of the excess carrier, in response to Laurence's letters of September 6 and 12, 2002;

3.  Laurence's representation to Keenan on March 12, 2003, that the available insurance coverage was $100,000;

4.  Pearson's letters to Keenan of March 26 and April 9, 2003, which stated that the coverage limit was $100,000 and that there was a remaining balance of $95,855.52 on the policy;

5.  Pearson's alleged statement to Keenan over the phone on March 27, 2003, that it was unlikely that a cab company would have excess insurance coverage; and

6.  Pearson's letter to Keenan of April 21, 2003, which stated that March Taxi had no separate insurance coverage for property damage and that the policy with Ace provided $100,000 combined single limit.

In light of the great difficulty experienced by Aquino in obtaining information about March Taxi's primary insurance coverage in the wake of the accident and in the state court litigation, two points are worth noting.

---

[14] For ease of reference, the legal analysis portion of this opinion will refer collectively to the March Taxi and its agent, Coleman, as "March Taxi" unless the context indicates otherwise.

First, Aquino does *not* contend that Ace's failure to provide information about its *own* primary policy in a timely manner violated Chapter 93A (other than the dispute concerning the meaning of "combined single limit"). That is true even though Aquino had ample reason to be unhappy, given Ace's apparent violation of Chapter 175, § 112C.[15] Second, Aquino does *not* contend that March Taxi's failure to comply with its discovery obligations in the state court litigation violated Chapter 93A, again notwithstanding ample reason for complaint.[16]

Instead, Aquino makes in essence two sets of claims: one set based on the alleged failure of Ace to disclose the existence of the excess policy written by General Star, and one set based on the alleged misrepresentations of Ace concerning the meaning of "combined single limit" in its primary policy. Each set of claims will be considered in turn.

### 1.    Alleged Failure to Disclose the Existence of an Excess Policy

The first set of claims concern the purported failure of defendants to disclose the existence of the excess policy.

### a.    Failure to Notify the Excess Carrier in December 2000

Aquino first alleges that Pacesetter's failure to notify the excess carrier of his claim after

---

[15] Keenan, who was Aquino's counsel, made a request in writing to Ace for disclosure of the coverage amounts on July 14, 2000. Under the statute, Ace was required to respond within 30 days. Instead, Ace did not provide the information until December 13 (by telephone) and December 20 (in writing), approximately five months later.

[16] Aquino's request for production of documents, served January 18, 2002, clearly called for the production of the declaration pages for both the Ace primary policy and the General Star excess policy. The responses were due 30 days (or possibly 45 days, depending on the date of service of the summons and complaint) later. March Taxi did not produce the Ace declaration page until September 20, 2002, more than eight months later, and never did produce the General Star declaration page.

The record does not indicate why March Taxi did not provide information about the General Star policy. March Taxi was presumably in the best position to know its own insurance coverage, and had the strongest incentive to put General Star on notice of a potential claim.

Clark spoke with Keenan on December 13, 2000, constitutes an unfair or deceptive act or practice.  Keenan's handwritten notes of their conversation state:  "100G combined single limits w/ Ace.  There is excess cov. w/ another carrier - sug. they be notified - Positive MRI?"  For present purposes, the Court will assume that the notes indicate that (1) Pacesetter was aware that there was an excess carrier and (2) Keenan advised Pacesetter to alert the excess carrier to Aquino's claim.  Pacesetter did not notify the excess carrier until April 3, 2003, almost two-and-a-half years later, and only after the $182,709.66 judgment in Aquino's favor.  Aquino contends that Clark's statement constitutes a misrepresentation within the meaning of Chapter 176D, § 3(9)(a).

A misrepresentation is, in substance, a false or misleading assertion of fact.  *See* Restatement (Second) of Contracts § 159 cmt. a (1979); BLACK'S LAW DICTIONARY 1022 (8th ed. 2004).[17]  But Clark's statement—if any—that there was excess coverage was not false, nor was it misleadingly incomplete.

A misrepresentation can also be a false statement of present intention.  *Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 152 (1963)  ("Present intention as to a future act is a fact," and therefore a false statement of present intention may be actionable) (quoting *Feldman v. Witmark*, 254 Mass. 480, 481 (1926)).  Here, however, the record does not indicate, and indeed Aquino does not claim, that Clark actually agreed to Keenan's suggestion that she contact the excess carrier, or that she otherwise led Keenan to believe that she would do so.  And even if Clark had

---

[17] *See Daniels v. Hudson River Fire Ins. Co.*, 66 Mass. 416, 416 (1853) ("Misrepresentation in the law of insurance is the statement of something as fact, which is untrue, and which the assured states, knowing it to be untrue, and with intent to deceive, or which he states positively as true, not knowing it to be true, and which has a tendency to mislead; such fact being in either case material to the risk.").  For present purposes, however, it is not necessary to address the requisite mental state of the speaker.

22

committed to notifying the excess carrier, but simply failed to follow through on the commitment, that does not amount to a "misrepresent[ation] [of] pertinent facts or insurance policy provisions relating to coverages at issue."  Mass. Gen. Laws ch. 176D, § 3(9)(a).

More generally, Aquino complains of Ace's failure to contact the excess carrier in December 2000 after an MRI revealed "positive" results (and thus, potentially, a claim in excess of the $100,000 policy limit).  That argument proceeds from an uncertain starting point:  plaintiff simply assumes that Ace had a duty to notify the excess carrier of any potential claim *for the benefit of the potential claimant*.  The source of that "duty" is, however, wholly unexplained.  In fact, the suggestion that Ace had an affirmative duty to discover the identity of the excess carrier and to provide the carrier with notice for *Aquino's* benefit—as opposed to the benefit of March Taxi (the insured) or General Star (the excess carrier)—does not appear to be grounded in any obligation imposed by law or contract, or for that matter in logic or practicality.[18]

As an initial matter, the principal duty to disclose the existence of the excess policy and the limits of its coverage to Aquino lay with March Taxi; indeed, March Taxi's failure to respond to a discovery request calling for production of that information triggered much of the confusion and delay in this case.[19]  March Taxi also presumably had an obligation under the excess policy to give notice to General Star, the excess carrier, when it became aware of a possible occurrence or

---

[18] It is also unclear how a breach of that purported "duty" constitutes "misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue" within the meaning of Chapter 176D, § 3(9)(a).

[19] It is true, of course, that Ace had a duty to defend March Taxi under the primary policy.  Ace retained Pacesetter to handle the claim, and ultimately retained attorney Laurence to defend the lawsuit in court.  But March Taxi (not Ace) had a duty to respond to the document request seeking evidence of insurance coverage.

claim that was reasonably likely to involve the excess policy.[20]  Had March Taxi done so, it is

likely that General Star would have contacted Laurence (as March Taxi's counsel) and/or Ace

well before the trial, and that the issue of coverage would have been resolved early on.

The SJC has not decided "whether a primary carrier ever could owe a direct duty to an

excess carrier concerning the primary carrier's handling of its obligations to the insured."

*Hartford Casualty Ins. Co. v. New Hampshire Ins. Co.*, 417 Mass. 115, 124 (1994).  Thus, it is at

least possible that Ace had certain direct obligations to General Star—for example, a duty to

settle Aquino's claim within its policy limits "if no reasonable insurer would have failed" to do so.

*Id.* at 121.[21]  It is also possible—although the Court takes no position on the issue—that Ace had

a legal or contractual duty to notify (or instruct its policyholder to notify) General Star of any

potential claim that might exceed the primary layer of coverage.[22]  But that obligation, if it exists,

is for the benefit of the *excess carrier* (to ensure that the excess carrier is not unfairly prejudiced

---

[20] The excess policy is not part of the record before the Court, but in all likelihood it contained a provision to the effect that General Star was entitled to receive notice from the insured (i.e., March Taxi) of any claim or occurrence that was reasonably likely to involve the excess policy.  *See* Scott M. Seaman & Charlene Kittredge, *Excess Liability Insurance: Law and Litigation*, 32 Tort & Ins. L.J. 653, 701 (1997) (noting most excess liability insurance contracts contain an express condition requiring the insured to provide notice of occurrences and claims). 13 Couch on Insurance, § 186:1 (3d ed. 1999) ("Rarely, if ever, in modern practice will a policy fail to explicitly impose" a duty on the insured to provide "[p]rompt and adequate notice of an event indicating that a claim will, or may, be, made under the policy.").  No notice of any kind was provided to General Star until Pearson's letter of April 3, 2003, after the trial and verdict in state court.  General Star did not, however, assert any form of late-notice defense, presumably because it had not suffered any prejudice.  *See* Mass. Gen. Laws ch. 175, § 112*; Employers' Liability Assur. Corp., Ltd. v. Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 472, (1997).

[21] In any case, such a "direct duty, if any, would be no greater than [Ace's] duty to its insured." *Hartford Casualty Ins. Co.*, 417 Mass at 124.  The SJC noted that "[t]he general rule is that an excess insurer has a claim based on equitable subrogation, but no right to a direct action against the primary insurer." *Id.*  A minority of jurisdictions have held that primary insurers have a direct fiduciary duty to excess insurers to handle settlements in good faith.  *See* Kent D. Syverud. *The Duty to Settle*, 76 Va. L. Rev. 1113, 1203-04 (1990).

[22] The Court is unaware of any decision imposing such a rule where the primary carrier was unaware of the existence of the excess policy.  In any event, Ace certainly had reason to doubt that it would prove necessary to involve the excess carrier, as Aquino's own projection of his damages was no more than half the coverage limit on the primary insurance policy.

by receiving late notice of a potential claim) or *the insured* (to ensure that the insured does not

lose excess coverage for failure to give notice).  Aquino points to no authority, and the Court is

aware of none, stating or suggesting that the primary carrier has a duty to *a claimant* to provide

notice to an excess carrier of a potential claim.  It may be a good idea, and it may even be

common practice in the industry, but it does not appear to be required by any law or regulation or

by the terms of any relevant contract.  It follows, therefore, that the failure of Ace to give notice

to General Star is not an unfair practice conferring rights upon a potential claimant under the

excess policy.

    In short, the Court cannot conclude that Ace's failure to notify the excess carrier in

December 2000 constituted an unfair claim settlement practice within the meaning of Chapter

176D, and therefore an unfair or deceptive act or practice within the meaning of Chapter 93A.

> **b.**    <u>**Failure to Provide Laurence with Information about the Excess Carrier**</u>

    Next, Aquino argues that Pacesetter's response to the two letters sent by Laurence's

paralegal on September 6 and 12, 2002, constituted an unfair or deceptive act or practice.  In

essence, Aquino complains that Pacesetter provided only the declaration page and insurance

coverage information of the Ace insurance policy, and not that of the excess carrier.

    The two letters were prompted by Aquino's discovery request in the state litigation that

March Taxi and Coleman produce "copies of the coverage selection pages of all insurance

agreements under which any person carrying on an insurance business may be liable to satisfy part

or all of the judgment which may be entered in this action . . . including so-called umbrella and

excess policies."  That request was served on March Taxi and Coleman, the defendants in

Aquino's personal injury suit; there is no evidence it was served directly on Pacesetter or Ace or

that those parties ever saw it.

In response to Aquino's request, the paralegal asked Pacesetter to furnish "*the* policy declaration page" of the March Taxi insurance policy by September 20; she did not relay Keenan's broader request for "the coverage selection page of *all* insurance agreements . . . *including so-called umbrella and excess policies*" to Pacesetter (emphasis added). Presumably, Laurence or the paralegal decided to narrow the scope of the request in the communication to Pacesetter, either inadvertently or with the expectation that Pacesetter would have access to documentation relating to the Ace insurance policy, but not to any other policy March Taxi might have carried with a different insurance company.[23] In any event, an attorney such as Laurence is an independent contractor with separate and distinct obligations to its client, the insured, and Ace cannot be held vicariously responsible for any errors of judgment by the attorney. *See Herbert A. Sullivan, Inc., v. Utica Mutual Ins. Co.*, 439 Mass. 387, 406 (2003).

Pacesetter's reply was timely, accurate, and complete: it faxed Laurence's office a copy of the declaration page of the Ace policy and an insurance coverage information form on September 20. Under the circumstances, Pacesetter committed no unfair or deceptive act in failing to provide Laurence's office with information about the excess carrier. Moreover, the fact that Clark (of Pacesetter) had already told Keenan of the existence of an excess carrier in December 2000 belies any suggestion that Pacesetter was attempting to conceal the information from Aquino.

---

[23] Indeed, at the time, Laurence did not even know that March Taxi carried another insurance policy; he first learned of the excess coverage from Keenan in March 2003, in the aftermath of the unexpectedly high verdict for Aquino. As noted above, it is unclear why March Taxi failed to apprise him of the information at an earlier date.

Accordingly, defendants' alleged failure to provide Laurence with documentation relating to the General Star policy in September 2002 was not an unfair claim settlement practice within the meaning of Chapter 176D.

**c.    Alleged Statement That It Was Unlikely That a Cab Company Would Have Excess Insurance Coverage**

Next, Aquino seeks to hold the defendants liable for Pearson's alleged statement to Keenan on March 27, 2003, that it was unlikely that a cab company would have excess insurance coverage. Keenan's notes of his phone conversation with Pearson on that date read: "[N]othing in file to ID excess carrier - unlikely cab co would have excess cov - looking into it . . . ." In the present context, the Court will assume that Pearson in fact made the statements attributed to him in Keenan's notes.

Pearson's statement that it was "unlikely a cab company would have excess coverage" was a statement of opinion regarding the insurance practices of cab companies. A false statement of opinion generally cannot constitute a deceptive act under Chapter 93A. *See Tagliente v. Himmer*, 949 F.2d 1, 8 (1st Cir. 1991) (statement by seller that land would have "great access to and visibility from major highways" constituted "nothing more than an opinion" and therefore not actionable under Chapter 93A). Furthermore, Aquino has provided no evidence that the statement itself was actually false or even misleading. *Cf. Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 78 (1991) ("The first requirement to sustain a claim of misrepresentation is that the representation made must be false."). In particular, Pearson did not represent that March Taxi had no excess coverage, nor did he misleadingly suggest that he had personal knowledge to that effect. To the contrary, Pearson immediately qualified his statement by adding that he would "look[] into" the question of whether March Taxi carried excess insurance, thus making it clear to

27

Keenan that he had no personal knowledge on the subject.[24]  And on the very same day, Pacesetter informed Keenan (through Laurence) that "there d[id] appear to be an excess insurer involved in the case" and that it would contact that insurer "in order to advise them as to what transpired in this case."  Thus, to the extent Pearson's statement created any kind of misimpression at all, it was corrected almost immediately.[25]

Finally, there is no reason to believe Pearson had any motive to deceive Keenan about the existence of excess coverage, as neither Ace nor Pacesetter stood to gain anything from Aquino's failure to learn that information.  *See Panzarella*, 2002 Mass. Super. Lexis at *54 (no liability under Chapter 93A where "there was no evidence of ulterior or nefarious motives on the part of [defendants] and no reason for them to purposely act to prevent the plaintiffs from learning of another insurer's policy").

In short, Pearson's statement was only an opinion; there is no evidence of intentional deception or bad faith; and any possible misunderstanding on Keenan's part was corrected the same day.  Under the circumstances, the statement does not rise to the level of a "[u]nfair claim settlement practice[]" within the meaning of Chapters 176D and 93A.

The Court will next consider whether the statements relating to the coverage limits of the Ace insurance policy constitute unfair or deceptive acts or practices under Chapter 93A.

---

[24] Indeed, nothing in the record indicates Pearson himself had confirmed the existence of an excess carrier.  In his March 21 letter to Laurence, Pearson referred to an "Excess Carrier," but did not name General Star.

[25] It is worth highlighting again that Clark had already told Keenan of the existence of an excess insurer more than two years earlier, during a phone conversation on December 13, 2000, and in a follow-up letter dated December 20.  Keenan had faxed a copy of that letter to Laurence only two weeks earlier (on March 13, 2003), in order to show him that March Taxi carried an excess insurance policy.  It is thus highly unlikely that Pearson's statement possibly could have deceived Keenan as to the likelihood that an excess policy existed.

2.      **Alleged Misrepresentations Concerning the Coverage Limit on the Ace Policy**

Aquino asserts that the defendants are liable for statements made by Pearson and Laurence relating to the coverage limit of the Ace insurance policy.  Specifically, he cites:  (1) Laurence's statement to Keenan on March 12, 2003, that the available insurance coverage under the Ace policy was $100,000; (2) Pearson's statement in his letters of March 26 and April 9, 2003, to Keenan that the coverage limit on the Ace policy was $100,000, and that a balance of $95,855.52 remained on the policy after a $4,144.48 payment to Aquino for property damage; and (3) Pearson's statements in his letter of April 21, 2003, to Keenan that March Taxi had a $100,000 combined single limit liability policy with Ace and that there was, therefore, no separate coverage for property damage liability.

In May 2003, an investigation conducted by Ace, at Pacesetter's request, revealed that there were in fact separate bodily injury and property damage coverage limits, and that Aquino was entitled to $100,000 for his bodily injuries, in addition to the $4,144.48 paid for property damage.[26]  Thus, there is no doubt that the statements at issue misrepresented the scope of the Ace insurance coverage, at least according to Ace's own investigation of the matter. Accordingly, the Court will consider whether any of those misrepresentations are actionable under Chapter 93A.

a.      **Laurence's Statement**

As to Laurence's statement, defendants argue that neither an insurer (Ace), nor its agent

---

[26] As noted above, the record does not indicate, and neither party has explained, exactly why or how Ace arrived at these conclusions.

(Pacesetter) can be held vicariously liable for the conduct of an attorney hired by the insurer to represent the insured.  Although that is an accurate description of the law in most instances, *see Herbert A. Sullivan*, 439 Mass. at 408-10, it is not Aquino's theory of liability with respect to Laurence's statement.  Aquino argues not that the defendants are vicariously liable for Laurence's statement, but that Pacesetter (and therefore Ace) is liable for providing Laurence with incorrect information (in 2002) about the coverage limit of the Ace policy, which Laurence in turn relayed to Keenan on March 12, 2003.  That claim will rise or fall in essentially the same manner as his claim based on the statements made directly by Pearson to Keenan without any intermediary.  The Court will thus turn to the issue of whether Pearson's statements are actionable under Chapter 93A.

### b.    Pearson's Statements

Aquino seeks to impose liability for Pearson's statements to Keenan that there was a $100,000 limit on the Ace policy; that there was no separate coverage for property damage; and that there was a remaining balance of $95,855.52 on the policy, because $4,144.48 had already been paid for property damage.

Pearson testified that he believed, based on the coverage confirmation form provided to him by Stone Insurance and the language of the Ace policy declaration page, that the coverage was $100,000 combined single limit.  The form itself so indicated.  There is no evidence to contradict that testimony or to otherwise suggest that Pearson intentionally misled Keenan or acted in bad faith.

Nonetheless, Aquino argues that Pearson's statements were negligent, and therefore actionable under Chapter 93A.  He apparently bases this argument on the fact that Pearson

initially relied on the information provided by Stone Insurance and on his own reading of the declaration page without seeking immediate clarification or a second opinion from Ace. However, Stone Insurance was, by all indications, a reliable source for information about the Ace insurance policy: it had initially sold the insurance policy to March Taxi and, as a non-party to Aquino's lawsuit, had no obvious motive to misrepresent the coverage limit. Moreover, as noted, the company's representation of liability limits (as "100,000 CSL") coincided with language used in the declaration page ("$100,000 Combined Single Limit") to describe coverage limits for property damage and bodily injury. Thus, because Pearson's statements resulted from a reasonable, albeit mistaken, interpretation of the insurance policy, they are not actionable under Chapter 93A. *See Guity*, 36 Mass. App. Ct. at 343 ("A plausible, reasoned legal position that may ultimately turn out to be mistaken . . . is outside the scope of the punitive aspects of the combined application of Chapter 93A and Chapter 176D); *United States ex. rel. Metric Electric*, 301 F. Supp. 2d at 70 (holding that inaccuracies did not give rise to a violation of Chapter 93A where there was no "deliberate misrepresentation of underlying facts" and "no indication that the [insurance company] did not believe [its conclusions] to be true at the time").

Even assuming *arguendo* that Pearson's statement rose to the level of negligence, a negligent misrepresentation, without more, is not ordinarily actionable under Chapter 93A. Pearson's conduct is this case was clearly not so "extreme or egregious" as to warrant a departure from that rule: not only did he obtain a coverage-confirmation form from March Taxi's insurance broker prior to making representations as to the scope of coverage, but he asked Ace to investigate the matter when Keenan proffered a competing interpretation of the coverage limits, and Pacesetter immediately revised its settlement offer in accordance with Ace's findings.

31

*Compare Glickman*, 21 Mass. App. Ct. 229, 235 (1985) (upholding finding of Chapter 93A

liability on a theory of negligent misrepresentation where the defendant "made *no* effort to

determine the truth," and the truth was "easily ascertainable") (emphasis added).

    Under these circumstances, Aquino cannot demonstrate that Pearson's inaccurate

statements concerning the scope of the Ace insurance coverage constituted an unfair or deceptive

act or practice within the meaning of Chapter 93A.

**III.    Conclusion**

    The lengthy delay in identifying the existence of the excess policy and the identity of the

excess carrier could have been readily avoided had March Taxi simply complied with its discovery

obligations in the state court proceeding.  That is not, however, the basis of plaintiff's claim in this

court.  Instead, plaintiff seeks to hold Ace and Pacesetter accountable for their failure to provide

information about, and to notify, the excess carrier, without demonstrating any basis for

establishing that they had a duty to do so.  While their conduct was perhaps less than perfect, it

does not amount to an unfair claim settlement practice under Chapter 176D, and therefore does

not constitute an unfair or deceptive act within the meaning of Chapter 93A.  Accordingly,

summary judgment will enter in defendants' favor.

**So Ordered.**

                              /s/ F. Dennis Saylor
                              F. Dennis Saylor IV
                              United States District Judge

Date: November 7, 2005